AETNA CASUALTY & SURETY COMPANY, etc., et al., Plaintiffs,

v.

TRACOR MARINE, INC., Defendant.

TRIO SHIPPING GROUP, INC., et al., Plaintiffs,

v.

TRACOR MARINE, INC., Defendant.

In the Matter of the Complaint of ENGINE AND LEASING COMPANY, Bultema Marine Transportation, Duo Partnership, and Trio Shipping Group, Inc., etc., et al.

Nos. 81–2229–Civ–Scott, 81–2233–Civ–Scott, 81–6380–Civ–Scott and 84–6245–Civ–Scott.

United States District Court, S.D. Florida, Miami Division.

Feb. 27, 1986.

Reginald Hayden, Nils Linford, Ralph Richard, Miami, Fla., for plaintiffs.

Morton Good, Henry Bolz, Smathers & Thompson, Miami, Fla., for defendant.

## MEMORANDUM DECISION: THE SINKING OF THE TUG TRIO BRAVO

SCOTT, District Judge.

## I. INTRODUCTION

This case presents a tortured history of litigation concerning the sinking of the tug, Trio Bravo, at Port Everglades on January 21, 1981. The culmination of this protracted bloodletting is the instant non-jury trial conducted over ten days.[1] This trial has not been a pleasant experience. It has been a particularly nasty piece of litigation with finger-pointing, accusations of misconduct and blatant false testimony.

This Court's patience has been repeatedly tested; nonetheless, it has attempted to provide a fair opportunity to all litigants to fully present their positions. Now, upon completion of the case, this Court enters its findings of facts and conclusions of law.[2] See, *Anderson v. Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In so doing, this Court has attempted to piece together the evidentiary web into some sort of rational, reasonable decision which brings this "odyssey of litigation" to a final conclusion.

## II. THE PARTICIPANTS

Plaintiffs are the owners and insurance carriers of the Trio Bravo ("Trio Bravo Group"). Because the actual ownership of the tug is not in dispute, there is no reason to detail the individual owners and ownership. The carriers are Employers Insurance of Wausau which provided "hull coverage" and by separate policy "protection and indemnity coverage"; and, Aetna Casualty and Surety Co. (the Water Quality Insurance Syndicate) which provided coverage for water pollution liability in an amount required by United States law for the Trio Bravo effective January 21, 1981. The Defendant, Tracor Marine, Inc., is a ship repairer to the maritime industry with its shipyard in Fort Lauderdale, Florida.

## III. THE TUG

The tug, Trio Bravo, formerly John Roen V, had a long and noble history prior to its sinking in the early morning hours of Janu-

---

1. See, Rule 9(h) of the Federal Rules of Civil Procedure. All cases have been consolidated by previous order. This judgment constitutes a final adjudication of all the above cases.

2. More specifically, questions concerning the amount of damages, the existence of negligence and proximate causation are treated as factual issues and thus subject to the clearly erroneous standard. *Noritake Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 725 (5th Cir.1980)

ary 21, 1981 and its final resting place as a reef. The tug, built in 1898,[3] had served in the Great Lakes for a number of years with distinction. The Trio Bravo was purchased in 1978 by its present owners and was used intermittently for two years. In late 1980, the tug sailed from the Great Lakes to Fort Lauderdale.

While in the Caribbean, the tug conducted one passage carrying steel scrap to Progresso, Mexico. It returned to Fort Lauderdale on January 17, 1981. During the passage, the tug experienced overheating due to the warm water of the South Atlantic. Marvin Sande, the Chief Engineer, "jerry-rigged" the machinery in order to enable it to work. The problem was the "heat exchanger" or cooler; and, the solution was to remove and chemically clean it.

## IV. THE TRANSACTION

This brings the evidentiary saga up to January 19, 1981 and the entry of Themos Gauchos and John Schaeffer. On January 19, 1981, Schaeffer, the Tracor Marine representative, contacted employee(s) of the Trio Bravo soliciting work. The Chief Engineer advised Schaeffer that he had a heat exchanger problem but that the work "had to be done quickly since the vessel had to depart as early as possible". Tracor did not have the manpower to do the job. Schaeffer contacted Themos Gauchos of Universal Marine and arranged to sub-contract the work. (At trial, the parties stipulated that Tracor was bound by the actions of Universal.) Tracor requested an $1,800.00 advance which was paid by Plaintiff. Although the agreement to repair was oral, it is beyond dispute that the parties entered into a contract for repair

and the Defendant warranted to perform the services in a workmanlike and competent manner.

On January 19, 1981, Schaeffer and Gauchos went to the Trio Bravo to assess the job. Later that day, acting upon instructions from Gauchos, Brian Strachan and Alvaro Higuera, employees of Universal Marine, disconnected the main heat exchanger.[4] They were not supervised and poorly instructed. Gauchos gave only oral instructions; no written work-order was ever prepared until long after the sinking. The heat exchanger could not be removed that day due to the unavailability of a crane.

At the time the main heater was disconnected, there was evidence of leakage. However, the employees of Universal did not close the valves leading to the overboard discharge or entry lines. Moreover, the employees failed to block off ("blank") the open pipes which remained after the heat exchanger was removed. On January 20, 1981, Strachan and Higuera returned and removed the main heat exchanger.[5]

## V. THE SINKING

At approximately 4:00 A.M. on the morning of January 21, 1981, the Trio Bravo sunk in navigable water of the United States when the vessel took on water and suddenly capsized to the starboard side at its dockside berth. The tug was moored alongside a shoreside rubber fendering system consisting of rubber bumpers. The only machinery running the engine room was the generator providing electricity and the boiler providing hot water.

Prior to the sinking, all of the valves in the engine room that might have allowed

---

3. The Trio Bravo was a single screw, diesel powered, 1400 horse powered awser tug, of riveted steel construction with steel deck house and wooden pilot house.

4. Parenthetically, it should be noted that the main engine of the Trio Bravo was cooled by fresh water circulating through the main engine and the heat exchanger, the latter serving the same function as an automobile radiator. Rather than air cooling the hot water as would be the case in an automobile radiator, the hot wa-

ter from the engine is cooled by a constant source of cooling water which flows through the surrounding coils in the heat exchanger itself.

5. There was some record evidence introduced largely through the testimony of Charles Smith, a surveyor, concerning the removal of a second cooler. That evidence, based almost on hearsay, is interesting, but of no probative value since the mystery of this casualty lies in the removal of the main heat exchanger.

entry of water into the vessel had been closed by Sande with the exception being the sea injection valve that provided cooling sea water to the operating generator and the generator overboard discharge. The valve between the discharge side of the main engine heat exchanger and the overboard discharge on the portside had not been checked by Sande.

The shoreside water main provided water to the vessel via a ship's fire hose. This fire hose was used to ballast the tanks in the vessel.[6]

A ship's fire hose had been rigged to the afterport fire station by Chief Engineer Sande for the purpose of providing sea water to wash down the towing chain. This hose did not have any pressure on it at the time of the sinking.

The Trio Bravo had been moored with its bow closer to the pier than the stern. During the afternoon of January 20, 1981, the Trio Bravo was brought parallel to the pier, in order to permit the repairman to remove the heat exchanger with a crane. The deflection plate was not damaged in any way that would restrict water flow. Lastly, there was no watch.

This scenario set the scene for the casualty.

## VI.  THE AFTERMATH

The sinking of the Trio Bravo brought immediate reaction and definite reverberation. The seeds of this sinking lie in (a) Schaeffer's decision to employ Themos Gauchos an uninsured, former employee whose operation can best be described as "sub-par"; and (b) the failure of Tracor to properly supervise Gauchos. The reality of

this poor business decision was graphically brought home on the morning of January 21, 1981 when Tracor discovered that the tug had sunk.[7] The monetary ramifications colored the Defendant's actions thereafter in its investigation,[8] its pre-trial handling[9] and, lastly, in the trial testimony of its employees.[10]

## VII.  THE ISSUE OF DUTY

■ Did Tracor Marine through its agent, Universal Marine, owe a duty to shut the valve and/or blank-off the main engine overboard discharge line following the removal of the heat exchanger? This Court concludes: (a) Tracor, through its subcontractor, had the responsibility and obligation to check and close this valve; and (b) Tracor, through its subcontractor, had the duty to blank-off the "Y" fittings on the pipe beneath this valve. The failure to blank-off these lines constituted poor and unacceptable marine practice. Tracor breached its warranty of workmanlike performance.

The Defendant offered testimony through various witnesses (Fischer, Ludeman, and the like) that it was Trio's duty to blank-off the lines. The Court rejects this testimony. Such evidence defies logic and common sense. The workmen hired to perform the removal of the heat exchanger had the duty to secure the valve which was connected to the removed cooler. See, *Hydro Space-Challenger, Inc. v. Tracor/Mas, Inc.*, 520 F.2d 1030 (5th Cir.1975). This is especially true when the very employee(s) who removed the heat-exchanger observed water leakage.

---

6.  The ship had been ballasted previously.

7.  This was best summarized by Tracor management when Stanley Weider opined, "Tracor bought the farm on this one".

8.  Tracor's investigation into this casualty could never be described as "objective"; instead Tracor, from the outset, took a position that it had to find a theory that could shift responsibility from its employees. This is exhibited in the shotgun defense presented at trial.

9.  In addition, this case was plagued by the disappearance of key documents (e.g. photos and memorandums), the "magical" emergence of other documents (e.g. workorders) and, alteration of still others (see, testimony of Ronald Dick) by Tracor employees. At best, this constituted a sorry and intolerable situation which this Court cannot condone.

10.  This Court rejects the testimony of Gauchos, Schaeffer and Weider. Their testimony was colored and, in part, blatantly false due to their desire to cover their poor business judgments.

Chapter closed on this issue; Tracor falls back to a secondary position on the question of duty. Defendant argues that Trio should have maintained a watch. Tracor opines that if Trio had posted a watch, the crewman would have prevented the sinking by early detection.

■ At initial blush, this argument appears attractive; however, upon subsequent reflection, the Court rejects this contention and adopts the testimony of Sargent and Ford who opined that a watch is not required. The issue of duty is a question for the trier of fact. *Noritake Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 725 (5th Cir.1980). It is likewise a question of reasonableness applied to the facts presented. Here, the Trio was in a secured port with security provided by port personnel. The tug had been docked for days without incident. There was simply no reason to post a watch under these circumstances. Certainly, there was no expectation of danger. Yes, the heat exchanger had been removed earlier that day, but wasn't Tracor a reputable firm which was expected to perform safe work? Finally, it must be noted that the crew's complement was small; in any case, hardly large enough to post an around-the-clock watch in a secured and safe port. Accordingly, the Court rejects this contention and finds that there was no duty by Trio under these circumstances. Concomitantly, the Court concludes there was no comparative negligence by Trio. See, *Noritake Co., Inc. v. M/V Hellenic Champion, supra,* at 728 ("Questions of negligence in admiralty cases are treated as factual issues and thus

11. While the defendant adopted a trenchwork of defensive positions, it is obvious that its "Maginot Line" was causation.

12. Conversely, the Court rejects as incredulous the arsenal of defense talent offered to explain away this loss. The cold, type-written transcript cannot capture the smugness, condescending manner, and obviously overreaching performance of these witnesses.

13. A less detailed version of this scenario is found in Ford's testimony:
"Q. What is that opinion?

subject to clearly erroneous standard.") This brings the saga to the next question:

## VIII. LEGAL CAUSE

■ Was the failure by Tracor to secure the valve and/or blank-off the main engine overboard discharge line the legal cause of the casualty? Again, this Court answers in the affirmative. In searching for the answer to this obviously pivotal question,[11] the Court is impressed with the demeanor and reasoning of the Plaintiffs' experts, Don Ford and Arthur Sargent.[12] Each approached this maritime mystery in an objective manner. The testimony of Ford and Sargent was credible and professional. In summary, the basis for their opinions "made sense" and comported with a reasonable interpretation of the physical evidence.

Their reconstruction of the evidence captured the following events. In the early morning hours of January 21st, as the tide started to rise, the portside of the tug hung up in the dock rubber fender system. As the tide continued to rise, the Trio Bravo began to heel to port. Water began entering the lower lip of the main overboard discharge aperature, down the pipe into the engine room. Once the main discharge aperature was below the water level, the tug began to sink more rapidly. As Trio Bravo was sinking, the portside mooring lines became very taut and caused the vessel to take a sudden list to starboard. When the tug took the sudden list to starboard, large amounts of sea water poured into the vessel through the open engine room door on the starboard side,[13] main deck, and the vessel sank within minutes.

A. The hull guard at the deck level of the tug caught underneath the fender system and when the tide came in the hull opening was under water.
Q. Then what happened?
A. The engine room filled. The vessel sank.
Q. Had the pipes been blanked off ..., (what) would have happened?
A. I think that if the pipes had been blanked off after the tide rose.... the tug would have rolled out from under the fender system and no water would have entered."
This Court agrees.

With this odyssey of litigation nearly at a conclusion, the Court now turns to the final chapter.

## IX. DAMAGES

As a result of the sinking of the Trio Bravo on January 21, 1981, the following damages were legally caused and reasonably incurred:

1. Aetna paid $73,272.43 for pollution cleanup costs. This amount was stipulated to be fair and reasonable.

2. Wausau paid under its protection and indemnity policy, these amounts for crew medical expense as a result of the sinking:

| | |
|---|---|
| Broward General Medical Center | $ 49.00 |
| Broward General Medical Center | 77.75 |
| Evelyn P. Dayton, M.D. | 930.00 |
| North Broward Radiologists | 395.00 |
| Broward General Medical Center | 18.00 |
| Broward General Medical Center | 16,198.55 |
| Evelyn P. Dayton, M.D. | 25.00 |
| Broward General Medical Center | 28.00 |
| Michael S. Goldstein, M.D. | 940.00 |
| Fisher, Williams, Surgical Assoc. P.A. | 75.00 |

Wausau should therefore recover $18,736.00.

3. Wausau settled the claim of Marvin Sande for $100,000. The parties stipulated this was a fair and reasonable amount. Wausau should recover this amount.

4. Loss of personal property claims were made by the following crew members of Trio Bravo and those claims were settled and paid in the following amounts, all of which were fair and reasonable:

| | |
|---|---|
| Mike Moneyham | $3,319.50 |
| Jo Ann Moneyham | 1,000.00 |
| Chris Foreman | 1,200.00 |
| Joseph Armah | 500.00 |
| Venive Heath | 965.79 |
| Ulf Huzell | 4,064.22 |
| Richard Butler | 744.25 |
| Lars Gillkvist | 429.83 |

Wausau should therefore recover $12,223.59.

5. Pursuant to the terms and conditions of protection and indemnity policy, Trio Shipping Group paid $5,000.00 toward these claims and Wausau paid the balance. These amounts are fair and reasonable and were paid as a direct result of the sinking of the Trio Bravo.

6. The total paid by Wausau under the P & I policy was $125,959.30. Trio Shipping paid $5,000.00.

7. Under its hull coverage, Wausau insured the value of the Trio Bravo at $400,000.00. Wausau claims that amount. Tracor counters arguing that the value is closer to $100,000.00. The Court finds, based upon disputed evidence, that $205,000.00 is a fair and reasonable value of the tug.

8. Wausau also claims $171,307.49 representing amounts paid for service and labor expenses plus surveyors. The Court after carefully considering the evidence, concludes that these amounts are fair and reasonable.

9. As a result of the sinking, the Trio Bravo Group incurred additional out-of-pocket expenses totalling $99,366.92, all of which are fair and reasonable and supported by Plaintiff's Exhibit 49 through 190. These expenses have been fully paid by the owner. Trio Bravo should receive these amounts.

10. On October 17, 1980, the Trio Bravo Group entered into a contract for the shipment of cargo from Port Everglades, Florida to Progresso, Yucatan, Mexico. As a result of the sinking, Trio claims lost profits arguing that it could not complete this contract. This Court disagrees. This claim is rejected because: (a) The claim is based on pure speculation and not proven by the evidence; and (b) in any case, other tugs were reasonably available to complete the contract. In summary, this Court cannot in good conscience award any damages for lost profits.

## X. CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of the litigation under the general maritime law and by

**532**

virtue of Rule (9) of the Federal Rules of Civil Procedure. Venue is proper in the Southern District of Florida.

2. Employers Insurance of Wausau and Aetna Casualty and Insurance Company, et al. (i.e. The Water Quality Insurance Syndicate) are subrogated to the rights of Trio Shipping Group.

3. Tracor Marine, Inc. failed to perform its services in a workmanlike and competent manner, thereby breaching its warranty to Trio Shipping Group. Tracor Marine, Inc. owed a warranty of workmanlike performance to Trio Shipping Group. *Todd Shipyard v. Turbin Services,* 674 F.2d 401 (5th Cir.1982); and *Parfait v. Jahncke Service, Inc.,* 484 F.2d 296 (5th Cir.1973).

4. Tracor Marine, Inc. was negligent which was a legal cause of injury to the Plaintiffs. There was no contributory negligence by Plaintiffs. The affirmative defenses of Tracor are rejected.

5. Plaintiffs are entitled to recover from Tracor Marine, Inc. for their damages in the following amounts:

| Employers Insurance of Wausau | $502,266.79 |
| Water Quality Insurance Syndicate | 73,272.43 |
| Trio Shipping Group | 104,366.92 |

6. The Plaintiffs are entitled to recover pre-judgment interest from January 21, 1981 at the rate of 12% per annum. *Gator Marine Service Towing, Inc. v. V.J. Ray McDermett & Co.,* 651 F.2d 1096 (5th Cir. 1981); *In Re M/V "VULCAN",* 553 F.2d 489 (5th Cir.1977).

7. Plaintiffs are entitled to recover taxable costs for which this Court reserves jurisdiction.

8. The Court reserves ruling and jurisdiction to decide the issue of attorneys' fees. The Plaintiffs shall submit memorandum within ten (10) days from the date of this order directed to their legal basis for an award of attorneys' fees. Authority shall be provided. The Defendant will respond seven (7) days thereafter.

9. The Court reserves jurisdiction to enlarge on these findings and conclusions if dictated.

10. Plaintiffs shall submit a Final Judgment in accordance with this Memorandum Decision within ten (10) days.